UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 06-20322-CR-ALTONAGA/Turnoff

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

DIANA SOTTO,

      Defendant.

_____/

## ORDER

On July 11, 2006, Defendant, Diana Sotto ("Sotto"), was charged by Indictment with three counts: Count One for conspiracy to defraud the United States, to pay health care kickbacks, and to receive health care kickbacks, in violation of 18 U.S.C. § 371; Count Two for conspiracy to commit health-care fraud, in violation of 18 U.S.C. § 1349; and Count Five with conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). She elected to proceed to trial with her remaining co-Defendants, and on October 2, 2006, a jury convicted her of all counts. On January 31, 2007, the undersigned sentenced Sotto to 121 months' incarceration and Sotto timely appealed on January 31, 2007. While the appeal was pending, on September 17, 2007 Sotto filed a Motion for New Trial Based Upon Newly Discovered Evidence [and] Request for an Evidentiary Hearing ("Motion for New Trial") [D.E. 419]. As a result, on September 28, 2007, the Eleventh Circuit Court of Appeals granted Sotto's motion to stay briefing on appeal and relinquished jurisdiction [D.E. 423] to allow the undersigned to consider the Motion for New Trial.

Since then, Sotto has filed numerous other motions and has requested and obtained several evidentiary and non-evidentiary hearings before the undersigned and before Magistrate Judge William Turnoff, thus explaining why the Motion has not been ruled upon earlier. For the reasons

Case No.  06-20322-CR-Altonaga

that follow, Sotto's Motion for New Trial [D.E. 419], as variously supplemented, is denied.

###### A.    *Procedural History Following the Motion for New Trial*

After the Eleventh Circuit relinquished jurisdiction to have the undersigned rule on the Motion for New Trial, Sotto has filed the following substantive motions and other documents, and these have been ruled upon by either the Magistrate Judge or the undersigned, as noted:

December 6, 2007 Motion to Compel Discovery of Additional *Brady*-Type and/or Favorable and Exculpatory Evidence [D.E. 436], denied by Order dated March 26, 2008 [D.E. 461];

December 6, 2007 Motion to Compel Discovery of Witness Interview Rough Notes [D.E. 437], denied by Order dated March 26, 2008 [D.E. 461];

Supplement to Ms. Sotto's Rule 33 Motion for New Trial Based Upon Newly Discovered Evidence [and] Request for an Evidentiary Hearing [D.E. 442];

April 8, 2008 Renewed Motion for Discovery of Additional and Objections *Brady*-Type Evidence and Request for *In Camera* Inspection Based Upon Newly Discovered Facts Revealed on March 25th, 2008, by the Government and Objections to Order and Report of the Magistrate Dated March 26th, 2008 [D.E. 467], granted in part and denied in part by Order dated June 2, 2008 [D.E. 492];

June 12, 2008 Objections to Order and Report of the Magistrate Dated June 2nd, 2008 [D.E. 493], denied without prejudice by Order dated September 12, 2008 [D.E. 521]; and

Second Supplement to Rule 33 Motion for New Trial Based Upon Newly Discovered Evidence [D.E. 498].

As stated, several hearings and evidentiary hearings were held before the undersigned and before the Magistrate Judge.  After the last of the hearings, held on September 12, 2008, on October

Case No.  06-20322-CR-Altonaga

14, 2008, Sotto filed Supplemental Legal Authority in Support of Ms. Sotto's Motion for Discovery of Additional _Brady_-Type Evidence, Rough Notes, And Request for _In Camera_ Inspection of Government Reports of Investigation and Witness Interviews [D.E. 530].  That Motion was denied by Order dated October 30, 2008 [D.E. 536].  On November 7, 2008, Sotto filed her Objections to the Magistrate's October 30th, 2008 Order [D.E. 537].

Most recently, on November 14, 2008, Sotto filed her Unopposed Motion Requesting Leave to Supplement Ms. Sotto's Rule 33 Motion for New Trial Based Upon Newly Discovered Evidence [and] Request for an Evidentiary Hearing [D.E. 541] and this, as well as her earlier Motion to Supplement [D.E. 498], were granted by Order dated December 8, 2008.  It appearing that all supplements have been filed and all evidentiary and discovery-related matters have been addressed, and to avoid additional delay, the undersigned addresses the merits of Sotto's Motion for New Trial, as supplemented.

### B.  _Motion for New Trial_

Sotto seeks a new trial pursuant to Rule 33, Federal Rules of Criminal Procedure.  She asserts the government failed to disclose material information favorable to her in violation of the due process clause.  In particular, the newly-discovered information pertains to FBI reports of pre-trial interviews with a government witness, Francisco Falcon, and of a non-testifying witness, Scarlet Duarte.

### 1.   Trial Evidence Pertaining to Sotto and the Charged Offenses

Sotto had a company, All Medical Billing Solutions ("All Medical"), through which she submitted claims to Medicare on behalf of a clinic called Project New Hope.  Sotto billed Medicare a total of $10,338,875.50 on behalf of Project New Hope for the purported treatment of AIDS

3

Case No. 06-20322-CR-Altonaga

patients. Medicare then paid Project New Hope at least $2,858,665.10. Various of the Co-Defendants paid cash kickbacks to the clinic's patients, and in return, the patients would sign blank treatment sheets and Superbills attesting to treatment. These forms were then filled in by a medical assistant, Co-Defendant Sandra Galvez. In some cases, patients signed for treatment on days when they did not see a medical provider. As to prescription drugs Acthar and Baygam, Sotto billed Mediare for amounts in excess of the treatment sheets and Superbills filled out by Galvez.

Project New Hope paid All Medical 5% of its Medicare receipts, consistent with industry practice. Project New Hope also paid Sotto $42,500 in cash in November and December 2004. Project New Hope paid $447,246.13 to five additional shell corporations controlled by Sotto. Records kept by Co-Defendant Luis Manuel Fernandez show the payments to all five companies were in fact payments to Sotto.

Sotto held two of these corporations, Medical Consultants of Miami and Seapointe Investments, in her name. Bank records reveal the corporations did no true business. A third company, United Transport, was owned by John Sanchez. At Sotto's request, John Sanchez and his wife, Lori Sanchez, deposited Project New Hope checks in the United Transport bank account, and then either returned the money to Sotto in cash or wrote checks to third parties as directed by Sotto.

Sotto and her former employee, Scarlet Duarte, recommended to Duarte's stepfather, Francisco Falcon, that he incorporate a fourth company, Falcon Transport Services. In October 2004, Duarte went with Falcon and provided $100 to open a corporate bank account. Without Falcon's knowledge, Project New Hope checks were deposited into the account. Duarte asked her friend and co-worker, Claudia Velasquez, to cash checks from Falcon Transport "before tax season" since Duarte "needed to take money out of the account." ([D.E. 335] at 152-53). Another of Duarte's

Case No. 06-20322-CR-Altonaga

co-workers asked her boyfriend to cash Falcon Transport checks and return the cash to the co-worker.

According to Falcon, in late November 2004, after Falcon Transport had begun receiving Project New Hope funds, Sotto gave Falcon a $5,000 check[1] from Falcon Transport for his assistance. Falcon could not remember whether Duarte was present when Sotto gave him the check. On cross-examination, Sotto's counsel impeached Falcon with his grand jury testimony, in particular, his statement before the grand jury that he did not know whether Sotto was involved in any way with Falcon Transport. He stated in response to cross-examination concerning his grand jury testimony, "I couldn't have said that she didn't do that, because then how would I have opened up the corporation?" ([D.E. 259] at 128).

Claudia Velasquez cashed Falcon Transport checks at Duarte's direction. Velasquez told agents that Duarte had stated she needed to cash the checks for tax reasons and that Velasquez believed she was committing a crime. The report of the FBI interview of Velasquez was given to Sotto before trial. At trial, the government elicited Duarte's statement from Velasquez over Sotto's objections.

Duarte owned the fifth company, known as 24 Hour Network Solutions, in her own name. The bank records of 24-Hour Network Solutions also revealed that it did no true business.

On May 31, 2006, after the arrests of the five Co-Defendants named in the Indictment, Lori Sanchez (or CW) participated in a recorded conversation with Sotto. Again, Sanchez and her husband, John, controlled another shell corporation and used it to receive money from Project New

_____

[1] At trial, Mr. Falcon denied receiving a second check from Falcon Transport for over $3,000. Another witness later testified Mr. Falcon appeared to have endorsed the second check.

Case No.  06-20322-CR-Altonaga

Hope and return the money to Sotto in cash.  The following recorded conversation was played to the

jury:

CW:    I can't believe this.
Sotto:  Calm down.  Talk to me.  Don't break.

CW:    I'm not going to break, Diana.  (Unintelligible) I wasn't there but there was
       a Chino guy.
Sotto:  Fuck. . . . The problem is this Chino . . .

CW:    What?
Sotto:  . . . told MJ, "The biller is your friend."  He knows I'm their friend.  Which
       is fine.  There's nothing wrong with that.  The Chino. . .

CW:    I don't think I should be here.  I'm John's wife . . .
Sotto:  So?

CW:    . . . So you're saying that the biller . . .  They're going to connect everybody.
       I don't know what the fuck.  This is what they fucking handed John.
Sotto:  This is it?

CW:    They have more though.  They have more.  They think the endorsement –
       that's my endorsement.  This is the stamper that I stamped on the check.
Sotto:  They're trying . . .

CW:    I know what they're doing.  I'm just showing you.
Sotto:  I know I got you into this.  I'm your friend and I'm telling you right now,
       okay.  If it comes to it, which it's not going to, we all know that you cleaned
       money for me.  We know that.  You understand that?

CW:    I understand that.
Sotto:  The point is for you not to say that.  For you not to say anything.  They can
       come here. .   You know where they are right now?  There's 35 of them at
       MJ's house right now.

CW:    What?
Sotto:  Oh yeah.  Again, after they had arrested them all.  And it's very possible that
       all 35 of them are going to come here and take me, okay?  And I . .
       (unintelligible) . . . Fifth Amendment – don't have to say a word.. They can
       call my attorney.  I have his card in my pocket.  You guys just cannot talk.
       You guys can say, "I'm going to hire an attorney."

6

Case No. 06-20322-CR-Altonaga

CW:     That's what he told them.  The bottom line is I'm not speaking.  I'm hiring an attorney and that's it.

Sotto:  And you know want to know something.  That's all he has to do.  And if they go again, that's all he has to do.  And whatever they tell him, trust me when I tell you this, they're fishing.  They don't know anything, Lori.  If they knew, they'd tell you.  They're fishing.  They're trying to see if they can find something out.

                              *        *        *

CW:     . . . They do have the other checks.  And they told John that they've been watching this whole thing since September.  You know and they have a whole circle of people and he's next.  He's in the circle of next arrests and they're like. . .

Sotto:  They're going to tell him things like that.

                              *        *        *

Sotto:  . . . The point is that you haven't done anything wrong and John can't talk.  John can't mention my name.  We'll all get out of this but no names can be mentioned.

CW:     Okay.

Sotto:  As a matter of fact, nothing can be mentioned.  Where are his buses?  I own a transport service.  That's all I need to say.

                              *        *        *

Sotto:  I need you to do me a favor.

CW:     I need to go get an attorney.

Sotto:  Take anything out of your house that has anything to do with it.

CW:     What's that?  We don't have anything with the checks.

Sotto:  Get rid of it.

CW:     I shredded it, okay?

Sotto:  So did I.  So did I.

                              *        *        *

Sotto:  Okay.  Even if I get locked up, I will be out tomorrow.

7

Case No.  06-20322-CR-Altonaga

CW:     Right.
Sotto:  Do you understand that?  Not a problem.  So far, no names have been mentioned.

CW:     I understand, Diana.
Sotto:  Luis [Manuel Fernandez] gets out tomorrow.  No, listen to me.

*     *     *

Sotto:  He has to get his own attorneys.  Was this not done for me?

CW:     Yes.
Sotto:  Okay, what are you worried about?

CW:     I'm not.
Sotto:  I'm . .

CW:     But it's in his name. . .
Sotto:  I utilized him.  I made him do it for me.  But he can't say that.

*     *     *

Sotto:  . . . that.  But this is my point.  Luis gets out tomorrow.

CW:     Okay.
Sotto:  And Luis getting out tomorrow is going to explain to me how we're going to explain these things.

CW:     Because then you can . . .
Sotto:  I want to make tickets for patients.  Me and him are talking about this, to cover this.  This is not a problem.  This is not a big deal.

CW:     Okay, okay.
Sotto:  It looks like a big deal because the FBI will drive you insane, okay?

CW:     Uh huh, yeah, I mean . . .
Sotto:  Luis. .  Luis gets out tomorrow and him and me are going to talk about this.  About this and about mine, okay?  Don't think I don't have a check to my fucking company and my investment company, and everything.  Don't think they won't find out.  Believe me.

CW:     I know.
Sotto:  Scarlet's [Duarte] tied in.  Scarlet's mother's tied in, okay?

8

Case No.  06-20322-CR-Altonaga

CW:     Has anybody approached them?
Sotto:  No, not yet.  But now I have to call her.  That means they're going to . . .

                              *        *        *

Sotto:  I finally spoke to a lawyer yesterday.  I don't need him. My name is nowhere
        to found [sic] yet, you understand me?  But I am behind all of this.

CW:     Right.
Sotto:  So I need a lawyer.  So I got a lawyer.

                              *        *        *

Sotto:  He hasn't done. . .  Listen to me.  He hasn't done his 2005 taxes for his
        corporation, yet.

CW:     Right.
Sotto:  You know?

CW:     He never filed the taxes or anything for that corporation.
Sotto:  He could always do it.

CW:     Right.
Sotto:  As long as he pays the bill.

                              *        *        *

Sotto:  I'm serious too.  And whatever you have in the house, get rid of it and don't
        worry about it.  Wait till Luis gets out tomorrow.  We'll take care of it.

CW:     I never even had copies of those checks.
Sotto:  Really, there's nothing wrong.

CW:     No, I know.  I have the deposit slips.  I have the . . .
Sotto:  (Whispers) I have them all.

CW:     You have them all?  But I . . .
Sotto:  The checks that were written to me, you, and Scarlet and my people that I am
        responsible for.

CW:     I shredded everything though.
Sotto:  I have it in a very good place, though.  But I have it.  You know why?  Cause
        I need to remember for the tickets so when Luis gets out tomorrow, we're

                                      9

Case No.  06-20322-CR-Altonaga

gonna talk about the tickets.  How are we gonna do the transport tickets?  As long as John has a reason why.

CW:     Yeah, obviously, cause he has nothing to back up and transporting and all that.
Sotto:  (whisper) But I can do it.

CW:     I know.  I know.
Sotto:  And I plan to do that.

CW:     I know.  I know.

                          *        *        *

Sotto:  Cause he told them, "get them out.  Raise my bond."  If not, they would all have to stay in . . . . his daughter were [sic] giving money to the patients.

CW:     Huh?  The daughter?
Sotto:  She was giving money to the patients.

CW:     Huh?
Sotto:  Lori.  But you don't have anything to do with this.

CW:     I know.  I know.
Sotto:  This all has to do with paying patients.

CW:     And checks.
Sotto:  And writing checks.  This is nothing.  Luis was writing himself 40-50,000 every week.

CW:     But, see that's fucked up that he did that.
Sotto:  You understand now?

CW:     Yeah, I understand.  It's way bigger but they're trying to go after everybody.
Sotto:  They're trying to get everybody to tell on him.  They don't even know I exist.  I'm the biller.  I'm in the middle.  Since I'm in the middle, I need to cure the problem.

CW:     Okay.
Sotto:  I need to make the tickets for John . . . has to . . . There's only 5 patients involved in the whole thing.  Obviously, the transport would be for the other patients.

10

Case No.  06-20322-CR-Altonaga

CW:    I got you.
Sotto:  I know the 5 of them because they are on the indictment report that I have.

CW:    That's how this whole fucking thing started?  Well, you know, Luis is a greedy motherfucker to fucking get everybody into this bullshit.
Sotto:  Lori, I didn't make anything.  Remember, I told you how he got me.  I didn't make anything out of you 90,000.  Scarlet was 61 . . .

CW:    And he made all this money?
Sotto:  $3 million.  And then his wife was asking me for money to get him out.  All I have is $20,000 and if I go to jail, I need that money.  I'm not giving her shit. .

CW:    Of course.  Of course.
Sotto:  And my attorney told me not to speak to her.  I'm not going to speak to her.  I'm gonna speak to him when he gets out.  Cause he better cough it up.  He better tell me what we're gonna do about this.

*       *       *

CW:    What he did was stupid and wrong but what he did was fucking greedy and heated everything up.  Know what I mean?  He's a motherfucker, you know?

([D.E. 298-4]).  Sanchez testified that she understood Sotto's reference to "cleaning" money to mean that the companies "needed a way to get the money out so they wouldn't have to pay taxes." ([D.E. 337] at 188).  Sotto brought Sanchez false invoices, and Sanchez discarded these.  (*See id.* at 192-93).  Sotto had earlier asked the Sanchezes whether the they would be interested in running a "clean" or "clear" medical clinic.  (*See id.* at 198-99).

2.      The Claimed Newly Discovered Evidence

Sotto's request for new trial is predicated primarily on information not disclosed to her pertaining to Falcon and Duarte.  At a June 13, 2006 FBI interview of Falcon, Falcon stated Duarte asked him to open Falcon Transport.  She helped him fill out paperwork to incorporate the company.  He believed the company would transport patients to medical clinics and hospitals, but the company

11

never provided services.  Duarte gave Falcon a $5,000 check, and he cashed it.  Falcon knew Sotto was one of Duarte's best friends and believed Duarte was working with Sotto in regard to Falcon Transport.

At his June 27, 2006 testimony before the federal grand jury, Falcon stated Duarte came up with the idea to pen Falcon Transport.  She helped him fill out papers at a bank and deposited $100 to start the company.  As far as Falcon knew, Falcon Transport never did any business and was never paid any money.  Several months after the company was formed, Duarte gave Falcon a $5,000 check.  When asked if he knew whether Sotto was involved with Falcon Transport, he responded "No, I don't know."  (*Tr. Ex.* 1).  He further stated:

> Q:   When you were interviewed by the FBI on June 13th, you talked to them about Diana Soto [sic]; is that right?
> A:   Yes.
>
> Q:   And you said that you thought Diana Soto [sic] was involved some way with Scarlet Duarte, didn't you?
> A:   The two of them worked together.
>
> Q:   What did they do together?
> A:   The way that I understand it, I know nothing about what they did, but the way that I understand it, my stepdaughter worked for her . . . .
>
> Q:   Was Diana working with Scarlet Duarte with regard to getting the patients that you were going to transport?  Was that the idea?
> A:   I imagine so.

(*Id.*).

Falcon's grand jury testimony was given to Sotto before trial; indeed, she introduced it as evidence, and used it to impeach Falcon concerning his statement implicating Sotto in Falcon Transport.  The notes of Falcon's FBI interview, in which he stated *Duarte* convinced him to found Falcon Transport and paid him the $5,000, and in which he did not mention Sotto, were not produced

Case No.  06-20322-CR-Altonaga

to Sotto before trial.  The prosecutor turned them over on January 10, 2007, three weeks before the

sentencing hearing, explaining the failure to have done so before was as a result of inadvertence.

Scarlet Duarte was interviewed by the prosecutor on July 7, 2006 in the presence of her

attorney and FBI agents.  She stated Sotto offered to pay her to open corporations in Duarte's name.

Sotto suggested to Duarte to have Duarte's stepfather, Falcon, open a corporation and she opened

Falcon Transport with Falcon as its registered owner.  Duarte told Falcon little about the company

and handled all the deposits and withdrawals.  Sotto gave Duarte almost all or all of the Project New

Hope checks made out to Falcon Transport.

Duarte opened 24-Hour.  Sotto gave Duarte Project New Hope checks made out to 24-Hour

and Duarte deposited them into the 24-Hour bank account.  Duarte withdrew the money paid to 24-

Hour in small amounts of cash, following Sotto's instructions.  Duarte would then give the cash to

Sotto.  Duarte would do the same with Falcon Transport, except that she withdrew the money by

writing checks to friends.  The friends would cash the checks and keep a small percentage, giving the

remainder of the cash to Duarte.  Sotto paid Duarte 2% of the checks cashed; Duarte paid Falcon

$5,000.

Neither 24-Hour nor Falcon Transport provided any services to Project New Hope.  It was

Sotto who wanted Duarte to deposit checks into the account even though Falcon Transport did not

work for Project New Hope.  (*Sept. 12, 2008 Trans.* at 31).  Duarte, however, believed that Project

New Hope was a legitimate clinic.  She believed Fernandez and Sotto were just trying to avoid paying

taxes.  At an evidentiary hearing, Duarte clarified that her belief was simply her "assumption.  It was

nothing directly said to" her.  (*Id.* at 25; *see also id.* at 51).

Notes of the Duarte interview were not provided to Sotto before the trial.

13

Case No. 06-20322-CR-Altonaga

3.     Sotto is Not Entitled to a New Trial

Initially, the government challenges the propriety of Sotto using Rule 33 to seek a new trial on newly discovered evidence. "[A] Rule 33 motion filed more than seven days after the verdict may only address newly discovered evidence of innocence, not constitutional violations . . . ." *United States v. Spuza*, 194 Fed. Appx. 671, 674 (11th Cir. 2006). The government asserts an alleged constitutional violation must be raised in a motion for collateral review under 28 U.S.C. § 2255. ([D.E. 424] citing *United States v. Evans*, 224 F.3d 670, 673-74 (7th Cir. 2000)). Because Sotto's Motion raises the constitutional claim that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to produce the Falcon and Duarte interview notes, specifically by denying Sotto the ability to examine Falcon concerning the identity of the person who provided him the $5,000 payment (to seek to show it was Duarte), and by denying her the ability to present Duarte's protestations that Sotto never used the term money laundering and Duarte's belief that her activities were for tax evasion purposes, Rule 33 is not the proper procedural mechanism. Furthermore, although the Court may re-characterize an improper Rule 33 motion as a motion under section 2255 and reach the merits, *see Castro v. United States*, 540 U.S. 375, 381-82 (2003), it may not do so while a direct appeal is pending, *see United States v. Wilson*, 894 F.2d 1245, 1252 (11th Cir. 1990).

While the government may be correct in its procedural analysis, it advances no interest to avoid addressing the many challenges Sotto has raised in her Motion and its three supplements to the fairness of her trial and sentencing hearing. Thus, whether raised by a Rule 33 motion, or a motion pursuant to section 2255, the issue is addressed in this Order and its resolution may carry over to any other future motion Sotto chooses to present.

Turning then to the merits of Sotto's claim, to establish a due process violation, Sotto must

14

Case No.  06-20322-CR-Altonaga

show the government possessed evidence favorable to her, she did not possess the evidence and could not have obtained it with reasonable diligence, the government suppressed the favorable evidence, and that evidence was material. *Davis v. Terry*, 465 F.3d 1249, 1254 (11th Cir. 2006).  This standard is accordingly applied to each of the claimed *Brady* violations, the first involving the FBI Falcon interview notes, and the second involving the Duarte interview notes.

As to the first claimed *Brady* violation, Sotto fails to carry her burden.  First, the grand jury testimony, which Sotto had and used at trial to impeach Falcon with, specifically references the FBI interview of Falcon.  In the grand jury proceedings, after Falcon testified he did not know whether Sotto was involved in any way with Falcon Transport, the government asked Falcon if he had not stated in his interview that Sotto was involved with Scarlet Duarte.  Notably, Sotto never asked the government for the report of the FBI interview.  Thus, Sotto fails to show she could not have obtained the material with reasonable diligence.  *See id.*

Moreover, the FBI report does not contain material evidence.  Evidence is material for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability" is a probability sufficient to undermine confidence in the outcome."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).[2]  The report is not material, first, because whatever impeachment could be had of Falcon was accomplished through the grand jury testimony.  In his grand jury testimony, Falcon stated he did not

---

[2] Sotto argues that because the prosecutor knowingly used perjured testimony or failed to correct false testimony, she only need show a "'reasonable likelihood that the false testimony *could* have affected the judgment of the jury.'"  *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (emphasis in original) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).  The undersigned has not been persuaded that the prosecutor, who produced the grand jury transcript which on its face references an FBI interview, knowingly sponsored perjured testimony, and therefore this standard is inapplicable.

15

Case No.  06-20322-CR-Altonaga

know whether Sotto was involved in any way with Falcon Transport; at trial he conceded that testimony was inconsistent with his trial testimony implicating Sotto, and he could provide no explanation for the inconsistency.  That grand jury testimony was admissible for substantive purposes, *see* Fed. R. Evid. 801(d)(1)(A), while any FBI report could only have been used for impeachment.

The evidence is also not material because in her own words spoken to Lori Sanchez, and heard during trial, Sotto admitted the Sanchezes, the owners of Unified Transport, cleaned money for her. That evidence, combined with the evidence concerning Medical Consultants of Miami and Seapointe Investments, companies incorporated by Sotto in her own name and which did no business, would have been sufficient to support her conviction for conspiracy to launder money.  And the report was certainly not material to the outcome at sentencing, because Sotto in fact had the report three weeks before her sentencing hearing.  Notably, at sentencing she conceded she had paid Falcon $5,000 and that she was responsible for Project New Hope's payments to Falcon Transport.  (*See* [D.E. 344] at 35, 101; [D.E. 259] at 20; [D.E. 298] at 6).

As to the second claimed *Brady* violation concerning the notes of the interview with Duarte, a witness the government chose not to call, Sotto similarly fails to carry her burden.  It has not been shown that Duarte would have waived her fifth amendment rights and testified as a defense witness.[3] As to materiality, Duarte's answers, and her testimony before the undersigned concerning her ignorance of the suspicious activities that were going on around her, at Sotto's direction, may have

_____

[3] Sotto's statement that if Duarte had chosen not to testify, the FBI report "would have been admissible as evidence at trial via the case agent (at least)" ([D.E. 442] at 22), is wholly unpersuasive, as no exception to the hearsay rule would permit that.  Furthermore, Duarte's interview with the government neither waived her Fifth Amendment privilege nor did it confer on her immunity for anything other than her statements at the interview.

16

Case No. 06-20322-CR-Altonaga

been rejected as improbable and incredible.[4]  Furthermore, Duarte did not inform the government in her interview that Sotto had told her Project New Hope was legitimate or that it was not paying kickbacks.  All Duarte said was that she believed Project New Hope was legitimate and the purpose of the scheme of check writing and having money flow out through a company and check cashers was to avoid tax liability; notably Duarte never said Sotto had done anything to foster that belief.

As the government emphasizes in its opposition, Duarte's testimony may very well have inculpated Sotto.  Duarte stated Sotto asked her to open 24-Hour Network Solutions and Falcon Transport, the companies provided no services to Project New Hope, and Duarte gave Project New Hope money back to Sotto in cash.  Such testimony would have served to support a finding that Sotto conspired to conduct financial transactions designed to conceal the ownership and control of the Project New Hope funds.

And while Sotto argues Duarte's testimony would have supported a defense that she, Sotto, believed she was simply committing tax fraud rather than health care fraud, Lori Sanchez and Claudia Velasquez (a Duarte check casher), reported the purpose of check-cashing was to hide tax proceeds. Sotto, however, did not use this testimony to argue to the jury that her actions were designed to avoid tax liability.  Rather, Sotto objected when the government elicited from Velasquez that Duarte had told Velasquez the purpose of the check cashing was to get money out "before tax season for taxes." ([D.E. 335] at 152).  The Velasquez report, turned over to Sotto before trial, included reference to Duarte's tax avoidance statement.  Tellingly, Sotto never mentioned the possibility at any point during the trial that she was trying to help Project New Hope evade taxes.

---

[4] The undersigned found Duarte singularly unpersuasive with respect to her ignorance of the purpose of the check cashing scheme at the evidentiary hearing.

17

Case No.  06-20322-CR-Altonaga

Considering the two claimed pieces of newly discovered evidence collectively, *see Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995), or the additional "new" evidence addressed below, does not change the outcome.

### 4.    Sotto's Most Recent Supplement Does Not Persuade

In her most recent supplement [D.E. 498] to her Motion for New Trial, Sotto urges that the failure by the prosecution to turn over to her prior to trial rough notes from interviews of Falcon, a statement of the unindicted nominal owner of Project New Hope, Luis Fernandez (Co-Defendant Luis Manuel Fernandez's father), and notes of the interview of Lori Sanchez, also constitute *Brady* violations.  As to Falcon, in one set of notes taken by FBI Agent Frances Bougeois, Falcon says Sotto never spoke to him about Falcon Transport; in the set of notes taken from Agent Huy Nguyen the statement is not repeated.  The prosecutor inadvertently failed to produce the Bougeois report, which he only saw in June 2008, containing the favorable statement, but for reasons previously addressed in this Order, the statement was not material.  Sotto had Falcon's grand jury testimony in which he stated he did not know whether Sotto was "involved in any way" with Falcon Transport.  ([D.E. 424-2] at 1684).  Access to the Bougeois rough notes, in light of all of the evidence presented and Falcon's impeachment, would not establish a reasonable probability that Sotto would have been acquitted.

Luis Fernandez's written statement that he was the only owner of an unspecified business, he was the only one authorized to sign its checks, and the business had been closed for approximately one year, is not *Brady* evidence, as it is inconsistent with Sotto's theory of the case as presented, that is, that Sotto's cousin, Manuel Libera, owned Project New Hope.  Moreover, on July 24, 2006 the government turned over a report of a May 22, 2006 interview with Fernandez which repeats these averments contained in Fernandez's written statement.  Indeed, the report indicated Fernandez

18

Case No. 06-20322-CR-Altonaga

"provided a signed statement reflecting his ownership of [Project New Hope] and his signatory authority over [its] corporate account." ([D.E. 105] Ex. 4 at p. 2).

As to Agent Nguyen's notes of an interview with Lori Sanchez, those notes reflect that Lori Sanchez understood Sotto's use of the term "money washing" to mean the companies whose money Sanchez was receiving needed to get money out without paying taxes. The notes do not reflect that Sotto directly told Sanchez that; simply that it was Sanchez's understanding. The statement in Nguyen's report is not favorable to Sotto because, as previously explained, at no time did Sotto attempt a tax-fraud defense, notwithstanding the evidence she had from Velasquez (who testified over Sotto's objection that Duarte had told her Falcon Transport transactions were related to taxes) and from Sanchez (who testified she understood Sotto's discussion of money cleaning to refer to tax evasion). Moreover, if Sanchez developed her tax-avoidance understanding from Sotto, because Sotto made such a statement to Lori Sanchez, Sotto would have known it herself and would not have needed the government's assistance in obtaining that evidence.

### C.    Conclusion

For the foregoing reasons, Defendant, Diana Sotto's Motion for New Trial Based Upon Newly Discovered Evidence [and] Request for an Evidentiary Hearing [D.E. 419] is **DENIED** in part and **GRANTED** in part. To clarify, the Motion is granted to the extent that Sotto has received the evidentiary hearings requested.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 10th day of December, 2008.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

19